581 F.2d 941
 17 Fair Empl.Prac.Cas. 897, 47 A.L.R.Fed. 457,
16 Empl. Prac. Dec. P 8348, 189 U.S.App.D.C. 163
 SEARS, ROEBUCK AND COMPANY, Appellant,
v.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al.
SEARS, ROEBUCK AND COMPANY
v.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Appellants
(two cases).
 Nos. 77-1822, 77-1995 and 77-1996.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 31, 1978.
Decided June 9, 1978.
As Amended July 26, 1978.
Rehearing Denied July 26, 1978.
 
 Appeals from the United States District Court for the District of Columbia. (D.C. Civil Nos. 77-0393 and 77-0924).
 S. Richard Pincus, Chicago, Ill., for appellant in No. 77-1822 and cross appellee in Nos. 77-1995 and 77-1996.
 J. Ramon V. Gomez, Atty., E.E.O.C., Washington, D. C., with whom Beatrice Rosenberg, Asst. Gen. Counsel, and Raj K. Gupta, Atty., E.E.O.C., Washington, D. C., were on brief, for appellee in No. 77-1822 and cross appellants in Nos. 77-1995 and 77-1996.
 Barbara Kaye Besser, Cleveland, Ohio, Margaret Beller and Charlotte Hallam, Washington, D. C., were on brief, for intervenor in No. 77-1822.
 Robert E. Williams and Frank C. Morris, Jr., Washington, D. C., were on brief, for amicus curiae, The Equal Employment Advisory Council, urging reversal.
 Victor H. Kramer, Charles E. Hill and Douglas L. Parker, Washington, D. C., were on brief, for amicus curiae, Institute for Public Interest Representation, urging affirmance of the District Court's holding that the provisions of 18 U.S.C. § 1905 are inapplicable to disclosures of information required by Title VII of the Civil Rights Act of 1964.
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and MacKINNON and WILKEY, Circuit Judges.
 Opinion for the court filed by LUMBARD, Senior Circuit Judge.
 LUMBARD, Senior Circuit Judge:
 
 
 1
 In these appeals we address the question whether the Equal Employment Opportunity Commission (EEOC) may furnish to employees proceeding as private litigants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to § 2000e-17, information regarding employers whom the EEOC is investigating. The district court ruled that the EEOC could give to certain individual employees data accumulated pursuant to the EEOC's investigatory powers; the court also ruled, however, that the Commission is statutorily prohibited from giving to such employees information obtained by the EEOC during settlement negotiations with employers.
 
 
 2
 Sears, Roebuck & Co. (Sears), a nationwide retailer, appeals from the judgment of the district court insofar as it allowed the EEOC to give some information in its files concerning Sears to employees who have brought suit against Sears. The EEOC cross appeals from so much of the judgment as forbad release of information obtained during its negotiations with Sears. Finding that Title VII's prohibition on "making public" information secured by the EEOC during its investigations extends to any disclosure to persons outside the government, we reverse that part of the district court's judgment that allowed the EEOC to give employees of Sears data from EEOC files concerning Sears; in all other respects we affirm the judgment of the district court.
 
 I. FACTS
 
 3
 A motivating factor behind the Civil Rights Act of 1964 was Congress' concern over discrimination in employment as a cause of unemployment of minority members of the work force. See Blumrosen, The Duty of Fair Recruitment Under the Civil Rights Act of 1964, 22 Rutgers L.Rev. 465 (1968). Thus, as part of the Act, Congress enacted Title VII, 42 U.S.C. § 2000e-1 to § 2000e-17, which makes illegal certain "unfair employment practices" of employers, including the refusal to hire or the discharge of ". . . any individual . . . because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).
 
 
 4
 To facilitate compliance with Title VII's strictures, Congress created the EEOC; primary enforcement power was left to aggrieved employees, however. Many observers saw piecemeal enforcement by individuals to be an inadequate device for achieving the national goals of Title VII, See Sape & Hart, Title VI Reconsidered: The Equal Employment Opportunity Act of 1972, 40 Geo.Wash.L.Rev. 824 (1972), and so in 1972 Congress amended the statute to give the EEOC broad authority to bring enforcement actions in federal court, should negotiations fail to result in comprehensive settlements of Title VII violations by employers. See 42 U.S.C. § 2000e-5(b), (f)(1); Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); H. Friendly, Federal Jurisdiction: A General View 82-87 (1972). Indeed, to ensure that Title VII violations would be remedied whenever possible through a conciliation agreement reaching all employees of a given employer, Congress prohibited individual employees from bringing suit on their own behalf until after the EEOC has had an opportunity to investigate and settle charges of employment discrimination with the employer. See 42 U.S.C. § 2000e-5; Cf. Patterson v. American Tobacco Co., 535 F.2d 257, 272 (4th Cir. 1976). Thus, Title VII provides that once a charge of an unfair employment practice is filed with the EEOC by either a private party or a commissioner, the Commission must investigate the charge to determine whether there is reasonable cause to believe that the employer has engaged in illegal employment discrimination. If the EEOC finds reasonable cause to believe there has been a violation of Title VII, it must enter into conciliation discussions with the employer in an attempt to remedy the situation.[1] If these discussions fail, the EEOC may file suit against the employer in the district court. Furthermore, parties aggrieved by alleged Title VII violations may bring suit in federal court 180 days after filing charges with the EEOC, whether or not the EEOC has acted within that time.
 
 
 5
 To enable the EEOC to carry out its statutory role of negotiating settlements with employers, Congress gave the Commission authority to obtain certain information from employers against whom employment discrimination charges have been filed, and to enter into discussions with employers concerning such charges. The two statutory provisions at issue here, §§ 706(b) and 709(e) of Title VII, prohibit the EEOC from "making public" any information the EEOC receives as a result of its negotiations with employers or its request for information from employers.
 
 
 6
 On August 30, 1973, then-EEOC Chairman William H. Brown, III, acting under 42 U.S.C. § 2000e-5(b), filed with the Commission a charge against Sears, claiming that the company had engaged in unfair employment practices. Specifically, Brown alleged that Sears had discriminated against job applicants and employees across the nation on the basis of their race, sex, and national origin.
 
 
 7
 The Commission consolidated with Commissioner Brown's national charge the several hundred pending charges that had been filed by private individuals and organizations in various parts of the country regarding numerous instances of alleged employment discrimination by Sears.[2] This consolidation of complaints is consistent with the policy of the Commission to proceed against nationwide employers, whenever possible, by use of commissioners' complaints that potentially cover all those injured by the employers' alleged discriminatory hiring activities.
 
 
 8
 The consolidated EEOC proceeding against Sears was referred to the Commission's National Programs Division, now known as the Special Investigations and Conciliation Division, which requested, pursuant to 42 U.S.C. § 2000e-8(a), information from Sears concerning the company's hiring policies and activities. The information provided by Sears, dating in some instances from 1964, pertained to the operation of 168 of Sears' approximately 3,800 retail facilities, and revealed the sexual, racial, and ethnic makeup of approximately 30% Of Sears' work-force in various job categories, both hourly and salaried. Sears also gave data to the EEOC concerning recruitment, selection, evaluation, promotion, transfer, training, and compensation of Sears' employees, and details of the company's attempts to hire women and members of minority groups. Much of the data given to the EEOC had never been given out publicly by Sears.
 
 
 9
 Although Title VII expressly requires conciliation discussions between the EEOC and an employer against whom charges have been filed only after the Commission has determined there is reasonable cause to believe that the employer has engaged in unfair employment practices, See 42 U.S.C. § 2000e-5(b), it appears that the Commission regularly engages in discussions (known as "predetermination settlement discussions") prior to making such a determination, see 29 C.F.R. § 1601.19a (1977); this was done in the proceeding against Sears. Thus, on November 11, 1975, the EEOC began settlement discussions with Sears. As part of the offer and counteroffers made during some ten months of negotiations, Sears compiled and gave to the EEOC detailed statistical studies covering all of its approximately 420,000 employees.[3] The information concerning Sears' numerous employment tasks was organized into seven "Affirmative Action Job Categories," in an attempt to define the present status of Sears' equal employment endeavors, to establish specific goals for the employer, and to devise the basis for an agreement regarding back pay. It is undisputed that, but for its attempts to reach an agreement with the EEOC, Sears would not have compiled these statistical analyses. Also, as part of its negotiations with the Commission, Sears continued to supply up-to-date information concerning the company's affirmative action program.
 
 
 10
 On May 21, 1975, more than six months after the inception of the Sears settlement discussions, the Commission promulgated regulations specifying that "charging parties" (that is, private parties who have filed charges with the EEOC pursuant to 42 U.S.C. § 2000e-5(b)) and certain others alleged to be aggrieved by Title VII violations being investigated by the EEOC may be given EEOC investigative file data. See Section 83.5 of the EEOC Internal Compliance Manual. See also 29 C.F.R. § 1610.17(d) (1977). Thereafter, on March 12, 1976, the attorney representing two charging parties, Carolyn Hendrock and Donna Walker, requested that the EEOC turn over information pertaining to her clients which was contained in the consolidated EEOC Sears file. Some of the data sought had been obtained in response to EEOC investigative requests directed to Sears; other data were part of the statistical analyses that had been prepared by Sears and given to the EEOC during the course of settlement discussions. At the time of their request, Hendrock and Walker informed the EEOC that they intended to file a Title VII action against Sears on behalf of a class of employees, and that they were eligible to do so, as 180 days had passed since the filing of their charges with the EEOC.
 
 
 11
 On June 2, 1976, the Commission advised Sears of its intention to honor the requests for investigative file information concerning Sears. On August 12, 1976, after having obtained a postponement of the time for distribution of the file data, Sears filed suit in the Northern District of Illinois, seeking a declaratory judgment and an injunction prohibiting the Commission from disseminating the information requested. On March 4, 1977, the case was transferred to the District of Columbia on the motion of the EEOC, and Hendrock and Walker intervened as defendants on April 7, 1977. Since the initial request for material from the Sears EEOC file, several other attorneys, representing both individuals and classes, have made similar demands for information pertinent to their clients. Presently there are at least four private Title VII actions pending against Sears. Moreover, there are at present 343 private charges pending before the EEOC against Sears, all of which could ripen into lawsuits.
 
 
 12
 On April 19, 1977, having failed to reach agreement with Sears on a plan to remedy the alleged Title VII violations, the EEOC issued decision 77-21, finding that there was reasonable cause to believe that Sears had engaged in unfair employment practices. The 250-page decision included detailed analyses of much of the data given to the Commission by Sears during the investigation and settlement discussions. The EEOC then sent "Letters of Determination" to some private charging parties. These letters notified the employees of the EEOC's finding of reasonable cause, gave details of the factual basis for that finding, and stated that the complete Commission decision would soon be sent to them.
 
 
 13
 Sears, upon learning of the Letters of Determination and their promise of further disclosure, filed a second suit in the District of Columbia on June 1, 1977, seeking an injunction against distribution of investigative file data in the form of the letters or the decision. After enjoining Pendente lite all dissemination of EEOC material concerning Sears, the district court held a hearing on the sole factual issue in dispute (whether the Commission had promised Sears' attorneys it would hold confidential all information received during settlement discussions), and issued a single decision covering both of the Sears actions.
 
 
 14
 Largely relying on the Fifth Circuit's decision in H. Kessler & Co. v. EEOC, 472 F.2d 1147 (5th Cir.) (En banc ), Cert. denied, 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 398 (1973), the district court ruled that the EEOC was not prohibited by § 709(e) of Title VII, 42 U.S.C. § 2000e-8(e), from giving out file information to charging parties, provided that the information had been obtained by the EEOC under its investigatory powers, See 42 U.S.C. § 2000-8(a), rather than as a part of settlement discussions with the employer under investigation. See Sears, Roebuck & Co. v. EEOC, 435 F.Supp. 751 (D.D.C.1977). However, the district court, relying upon the policy supporting out-of-court settlements of Title VII disputes, ruled that information obtained by the Commission during settlement discussions cannot be disclosed to charging parties who request it, although the court recognized that "the appeal of symmetry" suggests that the prohibition of § 706(b) of Title VII has a scope similar to that of § 709(e). The district court also found that the EEOC had promised Sears that it would not disclose to anyone the information given to the Commission during settlement discussions. Last, the court found that, because EEOC decision 77-21 inextricably commingled material obtained by request of the EEOC with material obtained during settlement discussions, the decision could not be distributed to charging parties; and that Letters of Determination may include only a simple notification of the fact of the Commission's finding of reasonable cause.[4]
 
 
 15
 From this judgment of the district court both sides appeal. Sears appeals from that part of the judgment that allows the EEOC to give to charging parties information obtained through investigative demand. The Commission appeals from the judgment insofar as it precludes dissemination of factual data gleaned from settlement discussions and restricts notice to charging parties of the EEOC finding of reasonable cause.
 
 II. DISCUSSION
 A. § 709(e) INVESTIGATIVE MATERIAL
 
 16
 § 709(e) of Title VII provides in relevant part that
 
 
 17
 (i)t shall be unlawful for any officer or employee of the Commission To make public in any manner whatever any information obtained by the Commission pursuant to its (investigative) authority . . . prior to the institution of any proceeding under this subchapter involving such information. 42 U.S.C. § 2000e-8(e). (emphasis supplied)
 
 
 18
 The Commission argues that the crucial phrase in this provision, "to make public in any manner whatever," refers only to dissemination to members of the public other than charging parties. We disagree. We hold that by enacting § 709(e), Congress meant to prohibit the EEOC from giving information from its investigative files to any individual outside the government.[5]
 
 
 19
 An examination of the overall statutory scheme persuades us that Title VII was never meant to permit dissemination of EEOC investigative data to anyone not within the government. As we have noted, Congress, after seeing the inadequate results of relying on private actions for securing compliance with Title VII, settled upon comprehensive settlements negotiated by the EEOC as the primary mechanism to achieve the broad objectives of the Act. Through such agreements, compliance with the requirements of Title VII may be achieved with respect to All employees of a given company, rather than merely for those few who might happen to file charges and later bring private actions.
 
 
 20
 The EEOC, as enjoined by Congress, has adopted a policy favoring the consolidation of all charges against an employer, and negotiations concerning the employer's overall employment practices.[6] It would do violence to this scheme of negotiation and settlement if the Commission were permitted to encourage numerous private litigants by distributing information from EEOC files before the administrative procedures of Title VII had run their course.
 
 
 21
 The facts of the instant case illustrate the extent to which EEOC efforts to achieve an agreement with respect to nationwide employment practices may be undermined should the Commission be allowed to disseminate vast amounts of data to hundreds of charging parties. After nearly four years, the Commission has concluded its detailed investigation of Sears; extensive informal settlement discussions have been held already. Now that the EEOC has issued its formal determination of reasonable cause, the conciliation process mandated by the statute is to begin. Affording the charging parties virtually unlimited, free discovery by opening the EEOC files at this point would have the effect, as the district court stated, of "fueling private lawsuits," Sears, Roebuck & Co. v. EEOC, 435 F.Supp. 751, 757 (D.D.C.1977), and might thereby interfere substantially with the ongoing process of conciliation between the EEOC and Sears. Rather than focusing upon an immediate agreement that would result in the correction of Sears' employment policies as they pertain to the several hundred thousand people who currently work for Sears and the many thousands who apply to the retailer each year for employment, the EEOC and Sears would be forced to direct their attention toward the claims of a mere 343 individual employees whose lawsuits would be fueled by the EEOC information. In this way, the overriding public interest in the elimination of employment discrimination throughout Sears' facilities across the country would be subordinated to some extent to the interests of a few individual employees.
 
 
 22
 Moreover, Title VII provides no effective means to limit distribution of investigatory material to charging parties alone. Although the Commission extracted promises from requesting parties with respect to some of the information it proposed to distribute in the instant case, such promises obviously are not enforceable against those receiving information. At oral argument, counsel for the Commission asserted that the EEOC or employees could seek to enjoin parties from violating their agreement with the Commission. When pressed, however, counsel could point to no instance when this had been done. More important, injunctive relief would give little protection to employers once information given to charging parties had appeared in the news media, or otherwise had been distributed to the public at large. As there is nothing to prevent charging parties from redistributing what they receive from the EEOC to whomever they please, distribution of investigative file data to charging parties would be tantamount to distribution to the public at large.
 
 
 23
 If EEOC files were open to charging parties, employers, realizing the lack of any effective mechanism within the EEOC for restricting the use of information once it leaves the hands of the EEOC, in many cases would refuse to comply voluntarily with investigative demands by the EEOC under § 709(e), thereby forcing the Commission to use subpoena power and suit in the district court in place of amicable negotiations. By doing so, employers would at least have the opportunity to persuade a court to impose effective restrictions on the scope of distribution something which is beyond the power of the EEOC to do. Thus, if the statute were construed to allow distribution of investigatory data to individuals outside the government, the operation of the voluntary investigatory proceeding established by § 709(e) would be impeded in a fashion plainly not intended by Congress when it enacted the restriction on "making public" data gathered by the Commission.
 
 
 24
 Although the legislative history is sparse, we believe that Congress' intention in enacting § 709(e), viewed in light of the well-established practice throughout the government, was to forbid disclosure of sensitive data to any persons outside the government. Government agencies, such as the Department of Justice and the National Labor Relations Board, do not give to private litigants information the government has accumulated concerning parties it is investigating, absent some express statutory authorization or requirement to do so.[7] See, e. g., Consumers Union of United States, Inc. v. Saxbe, (1974) Trade Cases (CCH) P 75,057, at 96,759 (D.D.C.1974). Indeed, Congress itself has placed strict constraints upon what information the government may disclose with respect to certain sensitive governmental functions, such as investigations. See, e.g., 18 U.S.C. § 1905; Int.Rev.Code of 1954, § 7213. In doing so, Congress has no doubt been motivated by its concern that critical government activities may be impaired by excessive disclosure. See Charles River Park "A," Inc. v. HUD, 176 U.S.App.D.C. 286, 291, 519 F.2d 935, 940 (1975); National Parks & Conservation Ass'n v. Morton, 162 U.S.App.D.C. 223, 225, 498 F.2d 765, 767 (1974). Plainly these limitations on disclosure by agents of the Executive Branch (whether imposed by an agency upon itself or imposed by Congress) were meant to draw the line against giving information to those outside of the government. Thus, there is reason to believe that Congress in enacting § 709(e) had in mind the common prohibition against giving investigatory information to individuals outside the government.
 
 
 25
 The result we reach is not necessarily inconsistent with that reached by the Fifth Circuit in H. Kessler & Co. v. EEOC, 472 F.2d 1147 (5th Cir.) (En banc ), Cert. denied, 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 398 (1973). In that case, Judge Tuttle, speaking for the majority, ruled that the Commission could give to a charging party information from the individual's investigative file. Kessler, however, involved a single charge against an employer by one individual. There was no national, consolidated file, as in the instant case, and accordingly the investigatory material available was much more limited than it is here.[8] Further, distribution in Kessler was restricted to a single person, whereas here the EEOC is asking, as the trial court observed at the hearing on July 14, 1977, to be allowed to give information virtually to "anybody (it) want(s)."
 
 
 26
 To the extent that any language in Kessler may be inconsistent with our holding here, we decline to follow Kessler, as we believe that the statute gives the private Title VII litigant adequate means of prosecuting the litigation.[9] Thus, 42 U.S.C. § 2000e-5(f)(1) empowers federal courts to appoint an attorney for a Title VII litigant and to "authorize the commencement of the action without the payment of fees, costs, or security." Most important, under 42 U.S.C. § 2000e-5(k) the courts may "allow the prevailing party (in a Title VII action) . . . a reasonable attorney's fee as part of the costs." Thus, to the extent that an employer unreasonably impedes discovery in private litigation under Title VII, he risks increasing his own liability, inasmuch as he increases the attorney's fee of the plaintiff.
 
 
 27
 Finally, it is significant that one of the court's primary concerns in Kessler, the short time within which a litigant must bring suit after receiving notice that the EEOC (or the Attorney General in cases involving a governmental agency, See 42 U.S.C. § 2000e-5(f)(1)) has neither filed suit nor reached a conciliation, is no longer apposite: In 1972 Congress increased this time period from 30 to 90 days.[10]
 
 
 28
 Thus, we are not persuaded that aggrieved employees are unduly hindered in commencing suit within the required time unless they are given ready access to the investigatory files of the EEOC.
 
 
 29
 B. § 706(b) SETTLEMENT NEGOTIATION MATERIAL
 
 
 30
 § 706(b) of Title VII provides in relevant part that
 
 
 31
 (n)othing said or done during and as a part of . . . informal endeavors (at conciliation) May be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. 42 U.S.C. § 2000e-5(b) (emphasis supplied).
 
 
 32
 Having concluded that under § 709(e) the EEOC cannot give out information to any parties outside the government, we hold that § 706(b) imposes a similar restriction on the EEOC.
 
 
 33
 The use of the same language in § 709(e) and § 706(b) indicates that it should be given the same meaning in both sections unless there is some reason to do otherwise. We find no reason to construe the language in § 706(b) differently from our construction of § 709(e). On the contrary, there are compelling policy reasons for not allowing the EEOC to give, even to charging parties, information gleaned from settlement negotiations: only by keeping such data strictly confidential can employers be encouraged to discuss openly and frankly the possible grounds for an amicable resolution of the disputes at hand. As the trial judge perceptively stated, "(k)nowledge that anything 'said or done' by way of settlement with EEOC will be disclosed to potential litigants is bound to dissuade candor and even participation by employers in a negotiated settlement" (footnote omitted). Sears, Roebuck & Co. v. EEOC, 435 F.Supp. 751, 759 (D.D.C.1977).
 
 
 34
 We consider the scope of permissible disclosure under § 709(e) to be as narrow as that under § 706(b), and thereby protect the important policy of encouraging settlement by negotiation while at the same time recognizing the symmetry of these two provisions as drafted by Congress. Accordingly, we hold that, as with investigative data, information obtained by the EEOC during settlement discussions with employers cannot be disclosed to anyone outside the government.[11]
 
 
 35
 Affirmed in part, reversed in part and remanded to the District Court for further action not inconsistent with this opinion.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 If the EEOC determines that there is no reasonable cause supporting the charge, the private party who filed the charge (or on whose behalf the charge was filed, in the case of a commissioner charge) may, within 90 days after receiving notice of the EEOC's decision, bring a lawsuit in federal court against the employer. See 42 U.S.C. § 2000e-5(f)(1)
 
 
 [2]
 The precise number and nature of these charges are before us only in the sealed record on appeal and, like the details of Brown's charge, are not for public dissemination. See 42 U.S.C. § 2000e-5(b)
 
 
 [3]
 See Sears, Roebuck & Co., Annual Report, 14 (1975)
 
 
 [4]
 Following the judgment of the district court, Sears sought a stay, both in this court and in the Supreme Court. These requests were denied. After oral argument, Sears again requested a stay, pending our decision. We granted this request by order of April 14, 1978
 
 
 [5]
 To the extent that EEOC regulations conflict with our ruling, those regulations are invalid as contrary to the terms of Title VII
 
 
 [6]
 It appears that the EEOC has met with some degree of success in negotiating settlements with large employers accused of Title VII violations. See EEOC, 10th Annual Report, Lab.L.Rep. (CCH), No. 22, at 8 (July 8, 1977)
 
 
 [7]
 The Freedom of Information Act, 5 U.S.C. § 552 (1976), provides just such explicit authorization, absent overriding statutory prohibition. See 5 U.S.C. § 552(b)(3) (1976); Project: Government Information and the Rights of Citizens, 73 Mich.L.Rev. 971, 1055 (1975)
 
 
 [8]
 Indeed, the court in Kessler emphasized that it was "dealing . . . with a very limited form of disclosure . . ." 472 F.2d 1147, 1149 (5th Cir. 1973) (En banc )
 
 
 [9]
 We do not concur in the inference drawn by the court in Kessler from the 1972 deletion in Conference without comment of an amendment to § 709(e) that would have expressly limited distribution of EEOC investigatory material to those within the government. The Conference's action may well have resulted from the feeling that the amendment was unnecessary, as it merely restated Congress' understanding of § 709(e) as it now stands
 Furthermore, we note that § 706(a) (now § 706(b), 42 U.S.C. § 2000e-5(b)), as applied by the court in Kessler, required the "consent of the parties" prior to dissemination of negotiation data. The statute, as amended in 1972, now requires the "consent of the Persons concerned " (emphasis supplied).
 
 
 [10]
 Although the Kessler opinion was filed more than nine months after the 1972 amendments to Title VII took effect, the court's opinion took no notice of the amendments
 
 
 [11]
 Our conclusion is further buttressed by the EEOC's own actions in repeatedly assuring Sears' negotiating representative that anything given to the Commission during negotiations would be held confidential. See Sears, Roebuck and Co. v. EEOC, 435 F.Supp. 751, 760 (D.D.C.1976). We believe, as the Commission itself indicates in its brief on appeal, that these assurances merely reflected what representatives of the EEOC believed to be required by § 706(b); we disagree with the Commission, however, concerning what "confidential" means
 We need not address the question whether information received by the Commission during settlement negotiations may be used as evidence in future proceedings instituted by the EEOC against Sears. We note, however, that any material given to the EEOC by Sears that the Commission could have obtained through the investigative mechanism of § 709(a) might well be immune from the § 706(b) restriction on use at trial.
 Moreover, because we find that both investigative and negotiation data may not be disclosed to charging parties, we need not address the question whether it is possible to separate the two as they appear in the Commission's written decision supporting its determination of reasonable cause or in the Letters of Determination. Anything more than a mere summary statement of the EEOC's finding would necessarily rely on either investigatory or negotiation data and therefore, as Judge Gesell ordered, cannot be distributed to persons outside the government.
 Of course, nothing in our decision affects the EEOC's authority to give out investigatory information after it has initiated suit. See 42 U.S.C. § 2000e-8(e).